UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————

D.C. EX REL E.B.,

                    **Plaintiff,**                    12 Civ. 1394 (JGK)

          - against -                    <u>OPINION AND ORDER</u>

NEW YORK CITY DEPARTMENT OF
EDUCATION, ET AL.,

                    **Defendants.**
————————————————————————————


JOHN G. KOELTL, District Judge:

     The plaintiff, D.C., brings this action on behalf of her

son, E.B., pursuant to the Individuals with Disabilities

Education Act ("IDEA"), 20 U.S.C. §§ 1400 <u>et seq.</u>, and Section

504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C.

§§ 794 <u>et seq.</u>, against the New York City Department of

Education and Dennis M. Walcott in his official capacity as

Chancellor of the New York City School District (collectively

"the Department").  The plaintiff challenges the decision of the

State Review Officer ("SRO") denying her claim for payment of

E.B.'s tuition for the Rebecca School, a private school at which

D.C. unilaterally placed E.B. for the 2010-2011 school year.

The SRO's decision affirmed in part the decision of an Impartial

Hearing Officer ("IHO").  The plaintiff also alleges that the

defendants discriminated against E.B. and violated Section 504

1

by not accommodating D.C.'s seafood allergy.  The parties have
cross-moved for summary judgment.  The Court has subject matter
jurisdiction pursuant to 28 U.S.C. § 1331 and 20 U.S.C.
§ 1415(i)(2)(A).

For the reasons explained below, D.C.'s motion for summary
judgment on the IDEA claim is **granted** and the defendants' motion
for summary judgment is **denied**.  All parties' motions for
summary judgment on the Section 504 claim are **denied**.


**I.**

"Under the IDEA, states receiving federal funds are
required to provide 'all children with disabilities' a 'free
appropriate public education.'"  Gagliardo v. Arlington Cent.
Sch. Dist. ("Gagliardo II"), 489 F.3d 105, 107 (2d Cir. 2007)
(quoting 20 U.S.C. § 1412(a)(1)(A)); see also Walczak v. Fla.
Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998).  A free
appropriate public education ("FAPE") must provide "special
education and related services tailored to meet the unique needs
of a particular child, and be 'reasonably calculated to enable
the child to receive educational benefits.'"  Walczak, 142 F.3d
at 122 (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982)
(internal quotation marks and citation omitted)).  Because the
IDEA expresses a "strong preference for children with

2

disabilities to be educated, 'to the maximum extent appropriate,' together with their non-disabled peers, special education and related services must be provided in the least restrictive setting consistent with a child's needs." <u>Id.</u> (internal citation omitted); <u>see also</u> <u>R.S. ex rel. A.S. v. Lakeland Cent. School Dist.</u>, No. 09 Civ. 9874, 2011 WL 1198458, at *1 (S.D.N.Y. March 30, 2011).

"To ensure that qualifying children receive a FAPE, a school district must create an individualized education program ('IEP') for each such child." <u>R.E. v. N.Y.C. Dept. of Educ.</u>, 694 F.3d 167, 175 (2d Cir. 2012) (citing 20 U.S.C. § 1414(d); <u>Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.</u>, 297 F.3d 195, 197 (2d Cir. 2002) (describing the IEP as the "centerpiece" of the IDEA system)).  The IDEA requires that an IEP be "reasonably calculated to enable the child to receive educational benefits." <u>Rowley</u>, 458 U.S. at 207.  In New York, the responsibility for developing an appropriate IEP for a child is assigned to a local Committee on Special Education ("CSE").  <u>Walczak</u>, 142 F.3d at 123.  "CSEs are comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others." <u>R.E.</u>, 694 F.3d at 175 (citing N.Y. Educ. Law

§ 4402(1)(b)(1)(a)).  "The CSE must examine the student's level of achievement and specific needs and determine an appropriate educational program." Id. (citing Gagliardo II, 489 F.3d at 107-08).

Parents in New York who wish to challenge their child's IEP as insufficient under the IDEA may request an impartial due process hearing before an IHO appointed by the local board of education. Walczak, 142 F.3d at 123 (citing 20 U.S.C. § 1415(f); N.Y. Educ. Law § 4404(1)).  A party may appeal the decision of the IHO to an SRO, and the SRO's decision may be challenged in either state or federal court.  Id. (citing 20 U.S.C. § 1415(g), 1415(i)(2)(A) and N.Y. Educ. Law § 4404(2)); see also R.S., 2011 WL 1198458, at *1.  In addition, if a school district fails to provide a FAPE to a child with disabilities, the child's parents may, at their own financial risk, remove the child from the improper placement, enroll the child in an appropriate private school, and retroactively seek reimbursement for the cost of private school from the state.  See Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 370 (1985).

Under the IDEA, a district court must conduct an independent review of the administrative record, along with any additional evidence presented by the parties, and must determine by a preponderance of the evidence whether the IDEA's provisions

have been met.[1] <u>Grim v. Rhinebeck Cent. Sch. Dist.</u>, 346 F.3d 377, 380-81 (2d Cir. 2003); <u>see also</u> <u>Gagliardo II</u>, 489 F.3d at 112.  This independent review, however, is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."  <u>Rowley</u>, 458 U.S. at 206.[2]

In a recent opinion, the Second Circuit Court of Appeals explained that "the standard for reviewing administrative determinations 'requires a more critical appraisal of the agency determination than clear-error review . . . but . . . nevertheless[] falls well short of complete de novo review. . . . [I]n the course of th[is] oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale.'"  <u>M.H. v. N.Y.C. Dep't of Educ.</u>, 685 F.3d 217, 244 (2d Cir. 2012) (quoting <u>Lenn v. Portland Sch.</u>

---

[1] Courts have noted that "summary judgment appears to be the most pragmatic procedural mechanism in the Federal Rules for resolving IDEA actions," but that "[t]he inquiry . . . is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed."  <u>Wall v. Mattituck-Cutchogue Sch. Dist.</u>, 945 F. Supp. 501, 508 (E.D.N.Y. 1996); <u>see also</u> <u>R.S.</u>, 2011 WL 1198458, at *1 n.1.

[2] This dual mandate has recently been described as "somewhat Janus-like."  <u>B.R. ex rel. K.O. v. New York City Dept. of Educ.</u>, No. 11 Civ. 8433, 2012 WL 6691046, at *3 (S.D.N.Y. Dec. 26, 2012).

Comm., 998 F.2d 1083, 1086-87 (1st Cir. 1993)).  "[T]he district court's analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court.  But the district court's determination of the persuasiveness of an administrative finding must also be colored by an accute [sic] awareness of institutional competence and role."  Id.

The Court of Appeals has also explained that "federal courts reviewing administrative decisions must give 'due weight' to these proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'"  Gagliardo II, 489 F.3d at 113 (quoting Rowley, 458 U.S. at 206, 208); see also Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 191 (2d Cir. 2005).  Deference to the decision in the administrative record is particularly appropriate when the administrative officers' review has been thorough and careful, and when the court's decision is based solely on the administrative record.  See Walczak, 142 F.3d at 129; Frank G.

v. Bd. of Educ., 459 F.3d 356, 367 (2d Cir. 2006); see also
R.S., 2011 WL 1198458, at *1.


## II.

The following facts and procedural background are taken
from the administrative record and the submissions of the
parties.  The facts are undisputed unless otherwise noted.


### A. IEP AND PLACEMENT

D.C is the mother of E.B., a child classified with autism
and diagnosed with pervasive development disorder, mild mental
retardation, and severe language disorder.  (Pl.'s R. 56.1 Stmt.
¶ 1; Defs.' Resp. to Pl.'s R. 56.1 Stmt. ("Defs.' 56.1 Resp.")
¶ 1; Ex. 1 ("IEP") at 5.)[3]  E.B. was born in 2000 and was ten
years old at the time of the 2010-2011 school year.  (IEP at 1.)
E.B. has also been diagnosed with asthma and has severe
allergies to seafood.  (Pl.'s R. 56.1 Stmt. ¶¶ 1-2; Defs.' 56.1
Resp. ¶¶ 1-2.)  E.B.'s seafood allergy is triggered not only by
ingestion of seafood particles, but also by skin exposure, such

---

[3] Exhibits with numbers refer to the defendants' exhibit appendix
that was submitted to the Office of State Review and has now
been submitted to this Court.  Exhibits with letters refer to
the plaintiff's exhibit appendix that was submitted to the
Office of State Review and has now been submitted to this Court.
Neither party challenges the exhibits.

as by touch, or aerosol exposure, such as by smell.  (Ex. X at 3; see also Tr. 289-96.)[4]  The allergy is so severe that it causes anaphylaxis, the most severe form of allergic reaction which is, by definition, life threatening.  (Ex. X at 3.)

E.B. has attended the Rebecca School, a non-public school in New York City, since 2007.  (Tr. 296.)  The plaintiff represents that the Department paid for the Rebecca School for the 2007-2008, 2008-2009, and 2009-2010 school years.[5]  (Tr. 27; Exs. R & S; Verified Pet.[6] ¶ 7.)

As of April 2010, there had not been a CSE meeting and E.B. had not received an IEP for the 2010-2011 school year.  (See IEP; Ex. F.)  On April 30, 2010, D.C. entered into an enrollment contract with the Rebecca School for E.B. for the 2010-2011 school year.  (Ex. Q.)  The plaintiff represents that D.C. entered into the enrollment contract because she was concerned

---

[4] "Tr." refers to the transcript of the impartial hearing before the IHO that has now been submitted to this Court.

[5] Prior to 2007, E.B. did not attend school because the Department allegedly failed to provide placement for him.  (Tr. 296; Verified Pet. ¶ 7.).  From 2007 to 2010, E.B. attended the Rebecca School, allegedly because the state-approved private schools recommended by the Department would not accept E.B. as a student because they were unable to address either his academic needs or his airborne seafood allergy.  (Tr. 296.)  The plaintiff asserts that the Department also paid for the Rebecca School for the 2011-2012 school year.  (Pl.'s Mem. Supp. Mot. Summ. J. at 4.)

[6] "Verified Pet." refers to the petition to the SRO that has now been submitted to this Court.

that the Department would fail to place E.B. at a school for the
2010-2011 school year, as it had in years past, and E.B. would
lose his spot at the Rebecca School.  (Verified Ans.[7] ¶¶ 44-45;
Hr'g Tr. 8, Feb. 22, 2013.)  The enrollment contract provided
that D.C. would pay tuition of $92,100.  (Ex. Q at 1.)  The
contract further provided that D.C. would have no obligation to
pay tuition if she subsequently placed E.B. in a school in
accordance with the as-of-yet undeveloped IEP for the 2010-2011
school year:

> [D.C.] will be released from continuing responsibility
> for tuition payments under this contract, and Rebecca
> School will reimburse [D.C.] for all prior payments,
> excluding the non-refundable deposit, upon written
> notice, no later than **September 7, 2010**, that [E.B.]
> has been enrolled in a class or school recommended by
> the Department of Education . . . in accordance with
> an IEP prepared by a [CSE].

(Ex. Q at 2.)

On or about May 25, 2010, the Department convened a CSE
meeting to develop an IEP for E.B. for the 2010-2011 school
year.  (Pl.'s R. 56.1 Stmt. ¶ 4; Defs.' 56.1 Resp. ¶ 4.)
Present at this meeting were D.C., E.B.'s mother; Spencer Leeds,
E.B.'s teacher from the Rebecca School; Gwen Levine, E.B.'s
social worker from the Rebecca School; Ellen Gordon, a school

---

[7] "Verified Ans." refers to the verified "Petitioner's Answer
and  Memorandum of Law to Respondent's Cross-Appeal" that was
submitted to the SRO and that has now been submitted to this
Court.

district representative and special education teacher; Dr.
Patricia Pape, a school psychologist; a parent representative;
and D.C.'s attorney.  (Pl.'s R. 56.1 Stmt. ¶ 4; Defs.' 56.1
Resp. ¶ 4.)

Because E.B. had attended the Rebecca School for the prior
academic year, the CSE relied primarily on two interdisciplinary
progress reports it received from the Rebecca School.  (See Exs.
R & S; Tr. 26-27.)  At the Rebecca School, E.B. had been in a
classroom with seven other students, one head teacher, and four
assistant teachers ("8:1:4").  (Ex. S at 1.)  The May 2010
Interdisciplinary Report indicated that with respect to
communication and reading comprehension, E.B. had improved
through the help of "maximum adult support."  (Ex. S at 2-3.)
Additionally, Ellen Gordon, a Department employee, observed E.B.
for one day at the Rebecca School.  (Ex. O.)  Her report made no
recommendation.

The CSE considered and rejected an IEP with
student/teacher/paraprofessional ratios of 12:1:1 and 8:1:1
because they were insufficiently supportive of E.B.'s needs.
(IEP at 16; Ex. F at 2.)  The CSE recognized that E.B.'s social
development was still "highly dependent o[n] adult engagement"
but believed that E.B. "was improving and expanding his ability
to respond to his peers . . . ."  (Tr. 53.)  The CSE decided

10

that a class ratio of six students to one teacher and one paraprofessional ("6:1:1") ratio was appropriate for E.B. (Pl.'s R. 56.1 Stmt. ¶ 6; Defs.' 56.1 Resp. ¶ 6.)  At the CSE meeting, E.B.'s mother, teacher, social worker, and attorney each expressed their opinions that E.B. needed more individualized support—closer to 1:1 as the 8:1:4 class at the Rebecca School had provided—than a 6:1:1 class could offer. (Tr. 49-51, Ex. F at 2.)  However, the CSE did not consider an 8:1:4 class, or any class with a ratio lower than 6:1:1. (Tr. 52.)  There was no dispute at the CSE meeting that E.B. required an environment that was seafood free.  (Tr. 35.)

The resulting IEP classified E.B. as autistic with a number of other disabilities and recommended a twelve-month school year.  (Pl.'s R. 56.1 Stmt. ¶ 6; Defs.' 56.1 Resp. ¶ 6; IEP at 5.)  The plaintiff represents that twelve-month school years begin in the summer term; therefore the May 2010 IEP called for E.B. to begin his new program in July 2010.  (Pl.'s Mem. Supp. Mot. Summ. J. at 6.)  The IEP provided that E.B. would be placed into a special class in a specialized school with a staffing ratio of 6:1:1 for the 2010-2011 school year.  (Pl.'s R. 56.1 Stmt. ¶ 6; Defs.' 56.1 Resp. ¶ 6.)  The IEP recommended related services in speech therapy, adaptive education and program accessibility.  (Pl.'s R. 56.1 Stmt. ¶ 6; Defs.' 56.1 Resp.

11

¶ 6.)  The IEP set a number of academic, physical, social and emotional goals as well.  (<u>See generally</u> IEP at 8-20.)  The IEP also indicated that E.B. had a severe seafood and fish allergy and there could be "no seafood in his environment" because he could go into anaphylactic shock.  (IEP at 1, 5.)  The IEP further provided that E.B. required an Epi-pen and a nurse on site to monitor his allergies and asthma.[8]  (IEP at 5.)

On June 14, 2010, the Department mailed D.C. a final notice of recommendation ("FNR") offering a classroom at P188X @ P034X ("P188") that allegedly provided the services listed in the IEP.  (Ex. 5.)  The FNR stated that "[i]f we do not hear from you by **June 28, 2010**, the recommended services will be put into effect for the 2010-2011 school year."  (Ex. 5.)  D.C. received the FNR on June 16, 2010.  (Ex. B.)  The following day, D.C. contacted P188 to arrange a tour and was informed that the earliest available tour date was July 13, 2010.  (Ex. B.)  During her phone call to P188, D.C. was allegedly told that all of the children at P188 were served lunch together in the cafeteria.  (Ex. C.)

---

[8] The IEP discussed E.B.'s asthma.  However D.C. does not challenge the IEP or the school placement in relation to E.B.'s asthma.  Therefore it is unnecessary to explain that condition in detail.

On June 22, 2010, D.C. notified the defendants of her intention to place E.B. unilaterally in the Rebecca School for the 2010 summer session and the 2010-2011 school year. (Pl.'s R. 56.1 Stmt. ¶ 9; Defs.' 56.1 Resp. ¶ 9; Ex. C.)  The 2010 summer session at the Rebecca School was set to begin July 6, 2010, a week before D.C. was scheduled to tour P188. (Ex. C.) D.C. alleges that she provided notice of unilateral placement in order to comply with IDEA's procedural requirement[9] and also to insure that if, upon a tour of P188 she found the facility inadequate, E.B. would have no interruption in his education. (Hr'g Tr. 8; Pl.'s Mem. Supp. Summ. J. at 4; Tr. 306-07.)  In the notice of unilateral placement, D.C.'s attorney explained that because D.C. was informed over the phone that all of the children at P188 were served lunch together in the cafeteria, D.C. had reservations regarding whether the school could accommodate E.B.'s allergy and provide a seafood free

---

[9] Under IDEA, a parent must provide notice of unilateral placement ten business days before removing the child and unilaterally placing the child in a private school.  See 20 U.S.C. § 1412(a)(10)(C)(iii)(aa)-(bb) ("The cost of reimbursement [for private school placement] may be reduced or denied . . . if . . . 10 business days . . . prior to the removal of the child from the public school, the parents did not give written notice to the public agency [rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense] . . . .").

environment as the IEP required.  (Ex. C.)  The letter indicated
that D.C. would be seeking tuition payment for the 2010-2011
school year as well as the provision of roundtrip air
conditioned transportation for E.B. to and from the Rebecca
School, which he required for his disability.  (Ex. C.)

On June 23, 2010, D.C. wrote another letter informing the
Department that because P188 was unable to provide a tour until
July, she would be unable to accept or reject the proposed
placement at P188 by the FNR deadline of June 28, 2010.  (Ex.
B.)  D.C. requested an extension of time to decide whether to
accept or reject the placement until she had taken a tour of
P188.  (Ex. B.)  Defense counsel conceded at the argument of the
pending motions that the Department did not respond.

D.C. placed E.B. into the Rebecca School for the summer
session.  (Tr. 307.)  On July 14, 2010, D.C. took a tour of P188
with her attorney, and with E.B.'s social worker, Gwen Levine.
(Ex. D at 1; Hearing Officer's Finding of Facts & Decision ("IHO
Op.") at 12.).[10]  On the day of the visit, seafood was posted on
the third floor cafeteria lunch menu.  (IHO Op. at 12.)  During
the tour, the P188 Parent Coordinator, Dawn Zerbo, informed the
visitors that the cafeteria was not seafood free and that P188
participated in the New York City School Lunch Program, which

---

[10] The IHO Op. was provided by the parties.

included fish on its menu.  (Tr. 393-95; Ex. Z at 2.)  Moreover,
students were allowed to bring lunch from home and that lunch
could include seafood.  (Tr. 394.)  The Parent Coordinator also
informed D.C. and Ms. Levine that seafood was prepared by high
school students in the on-campus work site cafeteria on the
third floor and was served in the teacher's lounge next door.[11]
(IHO Op. at 12; Tr. 310, 393; Ex. D at 2; Ex. Z at 2.)

     D.C. also spoke with one of the school nurses who confirmed
that, at the time of the tour, the environment was not seafood
free.  The nurse informed her that the school could not control
for the "airborne allergy" or the "smell trigger when the food
was being cooked."  (Tr. 310, 395; IHO Op. at 12; Ex. D at 2;
Ex. Z at 2-3.)  The nurse explained that "[E.B.] would be
isolated for lunch during the days when fish [was] served" by
eating in his classroom with a paraprofessional.  (Tr. 395; IHO
Op. at 12; Ex. D at 2; Ex. Z at 2-3.)

---

[11] The high school work-site cafeteria and the teacher's lounge
are located on the third floor and are allegedly inaccessible to
younger students.  (Tr. 141-45.)  The work-site cafeteria was
for the older students to learn culinary skills and the
students' food products were then sold to the faculty.  (Tr.
143-45.)  The cafeteria in which E.B. would have eaten was on
the ground floor and E.B.'s possible classroom was on the second
floor.  (Defs.' R. 56.1 Stmt. ¶ 77.)  The Department claims that
the seafood on the third floor would not have ever come into
contact with E.B. and moreover, had E.B. attended P188, the
school would have removed seafood from the menu in both
cafeterias and the teacher's lounge.  (Defs.' R. 56.1 Stmt.
¶¶ 76-77.)

On July 21, 2010, after the visit to P188, D.C. informed the Department, by a letter from her attorney, that she was rejecting the placement at P188 as inappropriate for E.B.  (Ex. D.)  The rejection letter explained that D.C. was rejecting the placement for several reasons: First, based on the information provided to D.C. during the tour, which the letter recounted in detail, P188 was not a seafood free environment as required in the IEP.  Second, the school lacked the proper occupational therapy equipment and the ability to accommodate E.B.'s therapy regime.  Third, the school used a teaching method, TEACCH[12] that was inappropriate and ineffective for E.B.  Fourth, E.B. would receive no more than 6:1:1 support, despite the requests during the CSE meeting for a lower ratio and more individualized support.[13]  (Ex. D at 1-2.)  The letter stated that if the

---

[12] "TEACCH" is an abbreviation for the Treatment and Education of Autistic Children and other Communication Handicaps method of teaching.  TEACCH uses a "very structured" environment with the philosophy that "if you create an environment where the child can be successful and independent, they will learn the skill [being taught]."  (Tr. 365.)

[13]  For various reasons, the only claim in the letter that is relevant to this proceeding is the claim regarding the seafood allergy.  D.C. has not challenged the IEP or the placement on the grounds of the occupational therapy equipment at P188. Furthermore, because the IEP indicated 6:1:1 class ratio, the challenge to the student/teacher ratio at P188 is actually a challenge to the IEP, not to the implementation.  Finally, because the Court finds that the Department failed to comply with the IDEA on other grounds, the complaint regarding the TEACCH methodology is unnecessary to reach.

Department recommended an appropriate placement, D.C. would be willing to take a tour to assess its adequacy. (Ex. D at 3.)

The Department neither offered an alternative placement nor attempted to correct any misimpression that may have been created during D.C.'s tour regarding the allergy protocol or lunch menu at P188. On February 23, 2011, D.C. filed a due process complaint notice requesting an impartial hearing and seeking direct payment of the student's tuition at the Rebecca School for the 12-month 2010-2011 school year, reimbursement for the deposit placed by the parent, and "any interest accumulated on a loan withdrawn for the tuition deposit." (Ex. E at 5.)[14] The complaint also requested air conditioned transportation for E.B. to and from the Rebecca School. (Ex. E at 5.)

The due process complaint alleged substantive and procedural deficiencies under the IDEA. Substantively, the complaint alleged that E.B.'s IEP was deficient in four respects: (1) the IEP did not adequately describe E.B.'s need to be in a seafood free environment; (2) the 6:1:1 ratio was insufficient to address his unique educational needs; (3) his IEP did not mandate physical therapy; (4) the IEP did not

---

[14] Unlike the majority of cases, in which a parent seeks reimbursement, in this case D.C. seeks direct payment of tuition to the Rebecca School, which required only a very small advance payment.

acknowledge that both the TEACCH and ABA methods of instruction were inappropriate for E.B. and that E.B. required the DIR/floortime method.[15]  (Ex. E at 2.)  Procedurally, the complaint alleged that the proposed placement at P188 was inappropriate because, (1) based on D.C.'s tour of the facility, it was not a seafood free environment, and (2) the teacher at P188 used the TEACCH and ABA method, which was inappropriate for E.B., and (3) E.B. would be in a 6:1:1 class but E.B. required more individualized attention.  (Ex. E at 3-4.)  On February 28, 2011, the Department responded to the due process complaint. (Ex. 7.)

### B. DUE PROCESS HEARINGS

An impartial hearing was convened over three nonconsecutive days from May 16, 2011 to June 13, 2011.  (Pl.'s R. 56.1 Stmt. ¶ 14; Defs.' 56.1 Resp. ¶ 14.)  At the hearing, there was

---

[15] ABA, TEACCH, and DIR are three different teaching methodologies for students with autism and other disabilities. "ABA," short for the Applied Behavior Analysis method, uses rewards and punishments to encourage and discourage certain behaviors.  (Tr. 364-65.)  "The TEACCH method differs from ABA therapy in that it places greater emphasis on visual skills, independent work, and group instruction." R.E., 694 F.3d at 179-80.  Developmental Individual Differences Relationship Model ("DIR") is a "way of looking at the students and coming up with an individualized program that looks at their developmental level, their sensory processing and their ability to have relationships."  (Tr. 344.)

testimony regarding, among other things, the 6:1:1 class ratio
and the ability of P188 to provide a seafood free environment.

Dr. Pape, a school psychologist that worked for the
Department and was present at the CSE meeting, testified at the
due process hearing.  Dr. Pape stated that although she had
never met or personally observed E.B., (Tr. 48.), she had
reviewed the Rebecca School reports on E.B (Tr. 27).  Dr. Pape
testified that the 6:1:1 program is "a class with children with
developmental delays who also have specific problems with
communication, socialization," which provides a "structured
environment" with the support of two adults.  (Tr. 28.)  She
explained that "due to [E.B.'s] constellation of disorders,"
E.B. needed a 12-month program with a low student to teacher
ratio and the 6:1:1 class size was appropriate for E.B.  (Tr.
29.)  Dr. Pape further stated that despite the 8:1:4 ratio at
the Rebecca School and the opinions of E.B.'s teacher, social
worker, mother, and attorney, the CSE did not consider
recommending a class with a ratio lower than 6:1:1 because the
CSE members "felt that [E.B.'s] needs could be met in a 6:1:1
. . . [I]t wasn't just the student teacher ratio, it's the fact
of the clustered symptoms and . . . [E.B.] just seemed that he
would fit into that kind of a class because it would deal with
all of those kinds of global concerns."  (Tr. 52-53.)

19

Janine Tubiolo, the assistant principal of P118 also testified regarding the appropriateness of the 6:1:1 class for E.B.  Assistant Principal Tubiolo admitted that although she had never met E.B., she had reviewed the documents concerning E.B., including his IEP.  (Tr. 76-77.)  The assistant principal testified that had E.B. attended P188, he would have been placed into Ronald Cook's class.  (Tr. 79, 121-23.)  The class had five other students and two paraprofessionals, a "classroom" paraprofessional and a health paraprofessional.  (Tr. 81, 125.)  The students ranged from 10 to 12 years old with reading levels ranging from 1.5 to about 4.7 and math levels from 1.5 to 4.  (Tr. 83-84.)  Mr. Cook used the ABA and TEACCH methodologies in the classroom.  (Tr. 124.)  Mr. Cook also grouped the students functionally by ability and provided one-to-one instruction as necessary.  (Tr. 93, 95-96.)  Assistant Principal Tubiolo further testified that the school had a variety of methods in place to address all of E.B.'s needs that were detailed in his IEP.  (See Tr. 87-100.)

D.C. presented substantial testimony explaining that E.B. required more than 6:1:1 support and discussing the methods used at the Rebecca School.  Tina McCourt, the program director at the Rebecca School explained that the staff at the school used the DIR teaching methodology.  (Tr. 344.)  Ms. McCourt had known

20

E.B. since his arrival at the Rebecca School in 2007. (Tr. 354-
55.) Ms. McCourt explained that each class had a ratio of one
teacher or teacher assistance to every two students. (Tr. 346.)
She also testified that at the Rebecca School, E.B. received
occupational, physical, speech and language, and art therapy.
(Tr. 361-62.) She opined that the current program at the
Rebecca School "provide[d] the support [E.B.] need[ed]" and that
the ABA and TEACCH methods would not be appropriate for E.B.
because ABA would "reinforce" his "rigidity" and TEACCH would
require him to learn skills independently whereas he required "a
lot of adult support." (Tr. 363, 366.)

    Marguerite Cohn, the head teacher of the Rebecca School and
E.B.'s teacher since July 2010, testified that E.B. had made
substantial progress over the course of the 2010-2011 school
year. (Tr. 230-31.) However, Ms. Cohn cautioned that E.B.
needed the "increased adult support" of the 9:1:4[16] class or he
had a "tendency to fall apart." (Tr. 226.) Ms. Cohn expressed
her opinion that E.B.'s social and communication skills had been
improving but that he "really needs that one-on-one support in
order to make these improvements." (Tr. 234.) Similarly, she
explained that E.B.'s reading had improved over the school year

---

[16] Although E.B. had been in an 8:1:4 class in the 2009-2010
school year, Ms. Cohn's testimony indicates that the ratio was
9:1:4 for the 2010-2011 school year.

because of one-on-one support; however with the recent
improvement, his need for this support was decreasing.  (Tr.
236, 238.)  E.B.'s math skills had also improved however he
"still need[ed] one-on-one support" during math instruction.
(Tr. 241.)  Ms. Cohn also expressed her opinion that the ABA
methodology would be inappropriate for E.B. because he would "be
more caught up on how" the reward and learning activity were
related rather than on learning the skill.  (Tr. 246.)  She also
explained that TEACCH methodology would be inappropriate for
E.B. because it was "very structured" and would prevent him from
working on the "flexibility" he needed to make progress.  (Tr.
247.)

      There was also substantial testimony at the hearing
regarding the ability of P188 and the Rebecca School to
accommodate E.B.'s seafood allergy.  Both D.C. and Gwen Levine
testified regarding what they had been told by the Parent
Coordinator and the nurse during their tour of P188.  (See Tr.
307-13; 392-95.)  Ms. Cohn also testified regarding the steps
the Rebecca School had taken to maintain a seafood free
environment for E.B.  She explained that the entire floor where
E.B.'s classroom was located was seafood free, that students
were not allowed to bring seafood to school, that seafood was
not served at school, and that she was trained in the use of an

Epi-pen which was kept in the classroom.  (Tr. 247-49.)  Ms. McCourt further explained that E.B.'s floor, as well as other common areas, were designated "seafood-free" zones, and a microwave was reserved solely for E.B.'s use.  (Tr. 356.)  She also explained that the nurse had trained the entire staff in the use of the Epi-pen.  (Tr. 357.)

Assistant Principal Tubiolo testified that children at P188 experienced a variety of allergies, including seafood allergies and other "airborne food allergies," and that P188 had a protocol in place to address these allergies: student allergies were posted outside of all classrooms and in the cafeteria to ensure the environments were allergen-free; teachers created allergy bracelets for students; P188 had two registered nurses on duty to address allergy issues; the nurses and 20 adults at the school were trained annually in the use of Epi-pens; and students' families were informed not to send snacks with items to which classmates were allergic.  (Tr. 106-07, 109-12, 146.) Merna Gordon, a registered nurse employed at P188, explained that when a child enrolls in P188, she meets with the parent to discuss allergies and work out a plan of care.  (Tr. 187-89.) Nurse Gordon testified that she reviews the cafeteria menu monthly for items to which students may be allergic and informs the teachers not to permit specific students to be present in

the cafeteria when certain meals are served.  (Tr. 190-91.)  She
further stated that when a parent tours the school, the Parent
Coordinator introduces the parent to one of the nurses, and at
that time the nurse and parent begin to discuss the student's
allergy.  (Tr. 207-08.)

With respect to whether P188 could accommodate E.B.'s
specific seafood allergy, Assistant Principal Tubiolo testified
that, contrary to what D.C. and Ms. Levine had been told on
their visit to P188, seafood was not served in the cafeteria,
the school followed the City's "special needs" menu which it
modified to exclude allergens, and that lunches brought from
home by students were checked by the staff.  (Tr. 108, 132, 138-
40.)  She further explained that although the third floor work-
site cafeteria sold tuna sandwiches in the past, E.B. would have
had no access to the third floor and, had he attended, tuna
would have been removed from the menu.  (Tr. 143-46.)  Nurse
Gordon testified that fish was not presently served at the
school and had not been on the menu "since last year."  (Tr.
198-99.)  She said that there was no fish served "in July"
because she had asked the cook.  (Tr. 199.)  Neither Nurse
Gordon nor Assistant Principal Tubiolo claimed that this
information had been relayed to D.C. prior to the impartial
hearing.

24

On July 12, 2011, the IHO issued her Findings of Fact and Decision.  (Pl.'s R. 56.1 Stmt. ¶ 14; Defs.' 56.1 Resp. ¶ 14; see IHO Op.)  The IHO held that the IEP and placement at P188 were appropriate and that the Department had offered E.B. a FAPE for the 2010-2011 school year.  (Pl.'s R. 56.1 Stmt. ¶ 15; Defs.' 56.1 Resp. ¶ 15.)

The IHO rejected D.C.'s argument that E.B.'s needs would not have been met in a 6:1:1 program.  The IHO explained that "[E.B.'s] behavioral needs, as described by his teachers, are not severe.  While he has benefitted from a lower student:teacher ratio at Rebecca, the evidence does not support at finding that [E.B.] requires a lower student:teacher ratio in order to learn."  (IHO Op. at 15.)  The IHO added that the testimony by the witnesses from P188 explained that P188 could accommodate E.B. because "[s]tudents are functionally grouped and receive one-to-one instruction when necessary."  (IHO Op. at 15.)

The IHO also summarily rejected the notion that P188 could not offer a seafood free environment because "both Ms. Tubiolo and Ms. Gordon explained credibly and in detail how they would prevent [E.B.'s] exposure to seafood and treat an allergic reaction to an exposure, should such exposure occur."  (IHO Op. at 15.)  Finally, the IHO found that although the Department had

25

offered E.B. a FAPE, the Rebecca School was nonetheless an appropriate unilateral placement for E.B. and that the equities supported reimbursing D.C.  (IHO Op. at 16-17.)  The IHO rejected the Department's argument that E.B.'s seafood allergy was not being adequately addressed at the Rebecca School.  (IHO Op. at 17.)  However, because she found that the Department had provided E.B. with a FAPE, the IHO denied D.C.'s request for payment of E.B.'s tuition for the 2010-2011 school year.  (IHO Op. at 18.)

Both parties appealed the decision of the IHO to the SRO. D.C. appealed the IHO decision that the Department had provided E.B. with a FAPE for the 2010-2011 school year.  The Department cross-appealed the parts of the decision which held that the Rebecca School was an appropriate unilateral placement and that the equities favored paying E.B.'s tuition.  On October 28, 2011, the SRO upheld the decision of the IHO that the Department had offered E.B. a FAPE and declined to reach the subsequent issues of the appropriateness of the unilateral placement or the equities.  (See Decision of State Review Officer ("SRO Op.").)

The SRO affirmed the IHO's decision that the 6:1:1 placement was recommended appropriately in the IEP.  The SRO explained:

> [T]he May 2010 CSE had adequate evaluative information
> available to it in order to determine the student's
> strengths and needs and support its recommendation for
> a 6:1+1 placement . . . . The IEP reflected that the
> CSE considered both a 12:1+1 and 8:1+1 placement and
> rejected them as insufficiently supportive for the
> student . . . . The school psychologist who
> participated in the May 2010 CSE meeting testified
> that a 6:1+1 special class provides a structured
> environment with two adults in the classroom and "a
> lot of support" for students with developmental delays
> and specific difficulties with communication and
> socialization. She further testified that the May
> 2010 CSE recommended a 6:1+1 class for the student due
> to his "constellation of disorders" . . . . which . .
> . would be addressed in the 6:1+1 environment.
> Moreover, the school psychologist testified that the
> student had been "improving and expanding" his ability
> to respond to his peers and that therefore, a 6:1+1
> environment would be appropriate given his needs. I
> also agree with the [IHO] that the hearing record does
> not reflect that the student's behavioral needs were
> such that a 6:1+1 environment would not have provided
> sufficient adult support for the student.

(SRO Op. at 11-12 (internal citations omitted).) In a

footnote, the SRO noted that "the parent, the student's

teacher and social worker from the Rebecca School, and the

parent's attorney expressed that they believed that the

student needed more support than a 6:1+1 class." (SRO Op.

at 12 (citation omitted).) The SRO concluded that, "the

hearing record does not show that the student could not

have received educational benefits in a 6:1+1 placement

with the supports [sic] and services recommended in the May

2010 IEP. Based on the above, I agree with the [IHO] that

27

the recommended 6:1+1 program in the May 2010 IEP offered
the student a FAPE for the 2010-11 school year." (SRO Op.
at 13.)[17]

The SRO also rejected D.C.'s argument that P188 was an
inappropriate placement because it could not implement the
IEP.  The SRO found that P188 could have appropriately
addressed E.B.'s seafood allergy and provided a seafood
free environment.  (SRO Op. at 17-18.)  The SRO relied on
the testimony of Assistant Principal Tubiolo and Nurse
Gordon describing the school's allergy protocols and
explaining the absence of fish on the school menu "since at
least July 2010." (SRO Op. at 18.)  The SRO decision did
not analyze or discuss the information allegedly provided
to D.C. and Ms. Levine during their tour of the facility.

The SRO further denied D.C.'s additional claims that
P188 was unable to implement the IEP because the academic
range of the students in E.B.'s class exceeded three years
and because the class used the ABA and TEACCH
methodologies, rather than the DIR methodology.  (SRO Op.
at 13-14.)  The SRO found that the students in the class
would have been "functionally grouped" with students close

---

[17] The SRO also rejected the parent's allegation that the IEP
failed to address E.B.'s seafood allergy.  (SRO Op. 13.)  That
decision has not been challenged here.

28

to his level and that the use of TEACCH and ABA rather than
DIR was not prohibited by the IEP and did not deprive E.B.
of a FAPE.  (SRO Op. at 14-17.)  Because the SRO found that
the school district provided E.B. with a FAPE, he declined
to reach the issues of whether the Rebecca School was
appropriate or whether the equities favored reimbursement.
(SRO Op. at 18.)  The SRO also declined to consider the
Section 504 claim because, as he noted, he lacked the
authority under New York law to review such a claim.  (SRO
Op. at 7 n.9.)

On February 24, 2012, the plaintiff filed a complaint
in this Court.  The Complaint challenges the decision of
the SRO and alleges violations of the IDEA, Section 504,
the New York State Educational Law, and Regulations of the
New York State Commissioner of Education.  (See Compl.
¶¶ 74-86.)  The plaintiff moved for summary judgment on the
IDEA claim and the Section 504 claim on June 29, 2012.  On
August 20, 2012, the defendants cross-moved for summary
judgment on the same claims.

### III.

The plaintiff first alleges that the Department violated
the IDEA and demands direct payment of E.B.'s tuition to the

29

Rebecca School for the 2010-2011 school year.  The Supreme Court
has established a two-part test to determine whether a party is
entitled to reimbursement: (1) was the IEP proposed by the
school district inadequate or inappropriate; [and] (2) was the
private placement appropriate to the child's needs.[18]  See
Gagliardo II, 489 F.3d at 111-12 (citing Burlington, 471 U.S. at
370).  If the two-part Burlington test is satisfied, the Court
has discretion to consider relevant equitable factors in
fashioning relief.  Id. (citing Florence County Sch. Dist. Four
v. Carter, 510 U.S. 7, 16 (1993)).  "Under New York's Education
Law § 4404(1)(c), the local school board bears the initial

---

[18] Although D.C. seeks retroactive direct tuition payment rather
than reimbursement, the Burlington analysis would apply to her
claim if such tuition payment is required under the IDEA
standards.  In either case, relief would only be warranted if a
court determined that the IEP was inappropriate and that the
private placement was proper.  Because a court's authority to
grant relief in IDEA cases derives from 20 U.S.C. § 1415(e)(2),
which authorizes "such relief as the court determines is
appropriate," equitable considerations would also be equally
relevant in a direct payment case.  See Burlington, 471 U.S. at
374; A ex rel. D.A. v. N.Y.C. Dep't of Educ., 769 F. Supp. 2d
403, 424 (S.D.N.Y. 2011) ("While the cases have focused on
parents' right to private school tuition reimbursement where
their child has been denied a FAPE — rather than prospective or
retroactive direct payment relief — that fact reflects the
practical realities and limitations of the administrative and
judicial review process set forth in IDEA rather than a
statutory limitation on the availability of prospective or
retroactive direct payment relief."); see also S.W. v. N.Y.C.
Dep't of Educ., 646 F. Supp. 2d 346, 360 n.3 (S.D.N.Y. 2009).

burden of establishing the validity of its plan at a due process hearing." R.E., 694 F.3d at 184.[19]

## A. Adequacy and Appropriateness of the IEP

Under the first prong of the Burlington test, a court must determine whether the IEP was inadequate or inappropriate.  In making this determination, courts engage in a two-part inquiry "that is, first, procedural, and second, substantive." R.E., 694 F.3d at 190.  D.C. alleges both procedural and substantive violations.

"At the first step, courts examine whether there were procedural violations of the IDEA, namely, whether the state has complied with the procedures set forth in the IDEA." Id. (internal quotation marks and citation omitted).  Procedural violations only entitle a parent to reimbursement "if they 'impeded the child's right to a [FAPE],' 'significantly impeded the parents' opportunity to participate in the decisionmaking

---

[19] The Supreme Court has left open the question whether the states could place that burden on the District, even in cases where a parent challenges the IEP.  See M.H., 685 F.3d at 225 n.3.  However, when a federal court reviews the administrative decisions reviewing the IEP, this Court is bound to exhibit deference to those decisions.  Id.  Nothing in this case turns on which party bore the burden of proof in the state administrative proceeding because that issue would only be relevant if the evidence were in equipoise.  Id.  That is not the case here.

process,' or 'caused a deprivation of educational benefits.'" Id. (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)). "Multiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not." Id. (citing Werner v. Clarkstown Cent. Sch. Dist., 363 F. Supp. 2d 656, 659 (S.D.N.Y. 2005)).

The plaintiff alleges that the Department violated the IDEA because P188 could not implement the IEP and therefore was an inadequate placement for E.B. Specifically, the plaintiff alleges that the proposed placement at P188 was inappropriate because, (1) it was not a seafood free environment, (2) the teacher at P188 used the TEACCH and ABA methods, which were inappropriate for E.B., and (3) E.B. would be in a 6:1:1 class but E.B. required more individualized attention. A review of the parties' arguments and the administrative record shows that at the time D.C. was required to make her decision whether to place E.B. unilaterally in the Rebecca School, the Department failed to demonstrate that the proposed placement could provide E.B. with his IEP-required seafood free environment. Therefore, without reaching the two other procedural objections to the proposed placement, it is clear that the proposed placement at P188 did not provide E.B. with the FAPE the IDEA requires.

32

The parties do not dispute that the IEP appropriately required a seafood free environment for E.B.  However, designing an appropriate IEP in accordance with the procedural and substantive requirements of the IDEA is only the first step. "[The Department] must also implement the IEP, which includes offering placement in a school that can fulfill the requirements set forth in the IEP."  O.O. v. District of Columbia, 573 F. Supp. 2d 41, 53 (D.D.C. 2008) (citing 20 U.S.C. § 1401(9) ("The term [FAPE] means special education and related services that . . . are provided in conformity with the [IEP].")); see also J.S. v. Scarsdale Union Free Sch. Dist., 826 F. Supp. 2d 635, 668 (S.D.N.Y. 2011) ("When an IEP's services are to be implemented at an outside placement, the recommended placement must not be wholly incapable of providing the services the IEP requires.") (citations omitted).  Procedurally, if P188 could not provide a seafood free environment for E.B. as the IEP required, the Department has by definition failed to deliver a FAPE.

Whether a procedural violation occurred depends on whether the SRO and IHO could permissibly rely upon the testimony of the P188 employees as to how P188 would have created a seafood free environment.  Assistant Principal Tubiolo and Nurse Gordon explained that had E.B. enrolled at P188, the school could have

33

taken the steps necessary to provide a seafood free environment.
In contrast, the testimony of D.C and Gwen Levine made it clear
that at the time of their visit to P188, the facility was
unprepared to provide a seafood free environment.  The plaintiff
argues that under the recent Court of Appeals decision in R.E.,
694 F.3d at 185-88, the statements of Nurse Gordon and Assistant
Principal Tubiolo were "retrospective" because they attempted to
change the record as it existed at the time D.C. made the
decision to place E.B. with the Rebecca School.  The plaintiff
argues that the SRO and IHO impermissibly relied on the
retrospective testimony of the nurse and the assistant principal
to find that the Department had provided a FAPE.  The defendants
respond that R.E. is distinguishable because it dealt with the
substantive adequacy of an IEP and retrospective statements made
to correct substantive deficiencies, not to the implementation
of the IEP.  The defendants further argue that extending R.E. to
cover testimony regarding implementation would make all
implementation testimony inadmissible, because it is necessarily
retrospective and speculative when a student never actually
enrolled in the proposed placement.  Finally, the defendants
claim that it would be inequitable to allow a plaintiff to
testify regarding school conditions but prohibit the Department
from offering rebuttal testimony.  Although R.E. dealt with a

34

somewhat different question, the animating principle is applicable in this case and requires reversal of the SRO decision.

In R.E., the Court of Appeals for the Second Circuit dealt with the issue of "retrospective testimony," "testimony that certain services not listed in the IEP would actually have been provided to the child if he or she had attended the school district's proposed placement." 694 F.3d at 185. In R.E., similar to in this case, parents of two disabled children alleged that their childrens' IEPs were deficient because they only mandated a 6:1:1 ratio but their children required more individualized 1:1 support. Id. at 179-80, 182-84.[20] The parents unilaterally placed their children in private schools citing the lack of individualized support as substantive failures in the IEPs. "In each of the cases . . . the Department offered retrospective testimony at the IHO hearing to overcome deficiencies in the IEP," namely that the specific classes the children would have been enrolled in offered significant 1:1 support, "and the SRO relied on this retrospective testimony in varying degrees to find that the

---

[20] R.E. was a consolidated appeal of three different cases. 694 F.3d at 174. Two of the cases dealt with classroom ratios while the third dealt with the failure of the CSE to conduct a "functional behavioral assessment." Id. at 176-84.

Department had provided a FAPE." Id. at 185. The Court of Appeals joined the majority of Courts of Appeals that have considered the question, rejected SRO reliance on retrospective testimony, and held that "testimony regarding state-offered services may only explain or justify what is listed in the written IEP. Testimony may not support a modification that is materially different from the IEP, and thus a deficient IEP may not be effectively rehabilitated or amended after the fact through testimony regarding services that do not appear in the IEP." Id.

The Court of Appeals explained the rationale behind the new rule prohibiting reliance on retrospective testimony:

> In order for this system to function properly, parents must have sufficient information about the IEP to make an informed decision as to its adequacy prior to making a placement decision. At the time the parents must choose whether to accept the school district recommendation or to place the child elsewhere, they have only the IEP to rely on, and therefore the adequacy of the IEP itself creates considerable reliance interests for the parents. Under the Department's view, a school district could create an IEP that was materially defective, causing the parents to justifiably effect a private placement, and then defeat the parents' reimbursement claim at a Burlington/Carter hearing with evidence that effectively amends or fixes the IEP by showing that the child would, in practice, have received the missing services. The Department's view is incorrect. By requiring school districts to put their efforts into creating adequate IEPs at the outset, IDEA prevents a school district from effecting this type of "bait and switch," even if the baiting is done

unintentionally. A school district cannot rehabilitate
a deficient IEP after the fact.

Id. at 186.  Therefore, in R.E., the Court of Appeals prohibited
reliance on retrospective testimony in order to protect the
parents' justifiable reliance on the IEPs when making their
placement decisions and to prevent school districts from
remedying defects subsequent to parental placement decisions.

    Although the issue in this case is the capability of the
proposed placement to implement the IEP, not the suitability of
the IEP itself, the reasoning of R.E. compels the same result
for retrospective testimony in this context as well.  Prior to
making a placement decision, a parent must have sufficient
information about the proposed placement school's ability to
implement the IEP to make an informed decision as to the
school's adequacy.  At the time the parent must decide whether
to accept the proposed placement or unilaterally place a student
elsewhere, the only information available to the parent about
the proposed placement are the FNR and, if the parent visited
the proposed placement, the information provided during the
visit.  The information a parent can glean from these two
sources creates considerable reliance interests because the
parent must decide, based solely on this information, whether to
take the financial risk of unilateral placement.

37

Under the approach advocated by the Department, the Department could propose a placement that was not prepared to implement the IEP, leading a parent justifiably to place the child unilaterally.  However the Department could defeat the parent's subsequent reimbursement claim by introducing evidence that the proposed placement hypothetically could have effected changes to implement the IEP.  This would result in the same "bait and switch" that the Court of Appeals condemned in R.E.

Moreover the application of R.E. to implementation of the IEP has already been recognized by this Court.  See B.R., 2012 WL 6691046, at *5-6.  In B.R., the IEP for K.O., B.R.'s nine year old autistic child, required one-on-one occupational therapy.  See id.  When B.R. visited the Department's proposed placement, the occupational therapist on staff informed her that occupational therapy was performed in groups of six students. Id. at *5.  Based on this information, B.R. unilaterally placed K.O. in the Rebecca School and sued for reimbursement, citing among other reasons, the inadequacy of the proposed school because it could not provide K.O with the required one-on-one occupational therapy.  See id.

At the IHO hearing, B.R. testified regarding what she had been told on her visit.  In contrast, witnesses for the Department testified that subsequent to B.R.'s visit, the

38

occupational therapist with whom she had met left the school, and the school began issuing vouchers (called "RSAs") for students to receive occupational therapy outside the school, including the one-on-one therapy B.R. required.  See id.  The IHO concluded that the vouchers were inadequate but the SRO reversed the IHO and concluded that the vouchers were adequate to implement K.O.'s IEP.  The parent challenged the SRO decision and this Court reversed the decision of the SRO.  Judge Rakoff's decision had two independent bases.  First, he concluded that the SRO's decision was made on the basis of "conclusory generalities and unsupported assertions."  Id.  Second, and more relevant here, Judge Rakoff explained that under R.E., it was improper for the IHO or SRO to rely upon any testimony regarding events that occurred after B.R.'s visit:

> [B]ecause both the departure of the occupational
> therapist and the alternative of RSAs (vouchers) to
> provide the one-on-one therapy were not raised until
> the impartial hearing was held, well after B.R. sent
> her rejection letter to the Department and filed her
> due process complaint seeking tuition reimbursement,
> it was improper for both the IHO and the SRO to
> evaluate whether the availability of RSAs in the
> absence of the occupational therapist afforded K.O. a
> free appropriate public education . . . Accordingly,
> the Court evaluates whether, at the time B.R. was
> actually considering the proposed placement, the
> school could offer occupational therapy in line with
> the IEP.

<u>Id.</u> at *5-6.  Judge Rakoff concluded that based on the record, the Department "failed to carry its burden of proof that K.O. would have received 1:1 occupational therapy outside the classroom."  <u>Id.</u> at *7.

The principle of <u>R.E.</u> and <u>B.R.</u> applies with equal force here.  At the time D.C. was considering placement at P188, the record indicates that the school could not provide a seafood free environment.  D.C. and Gwen Levine testified that at the time of their visit, seafood was on the lunch menu, the Parent Coordinator told them that seafood was served in the third floor cafeteria, that the school participated in the New York City School Lunch Program—which included fish on its menu—and that students could bring seafood lunch from home.  (Tr. 307-13, 392-95.) The IHO found that the parent coordinator told them "that the student cafeteria was not seafood free and that E.B. could eat in his classroom on days that seafood was served in the cafeteria."  (IHO Op. at 12.)  They each testified that the school nurse informed them that the school could not prevent the aerosol trigger of E.B.'s allergy. Evidence that the school could have taken appropriate precautions to provide a seafood free environment was not made known to D.C. until the impartial hearing, long after

40

D.C. sent her rejection letter and filed her due process complaint.[21]

Both the IHO and SRO relied on the testimony of the school staff explaining that had E.B. attended P188, the school could have been made into a seafood free environment.  This testimony was too little, too late.  It was too little because the school was not a seafood free environment at the time of D.C's visit, and it was too late because the proposed methods to control the environment were only explained at the IHO hearing, almost a year after D.C. had to make the placement choice for her son. This information was never provided to D.C. and there is no evidence that, at the time D.C. had to make her placement decision, she had any knowledge of the procedures that P188 could have undertaken.  Furthermore, there is no testimony in the record that, at the time of D.C.'s visit to P188, the school

_____

[21] It should also be noted that under the IDEA, D.C. was required to include the bases of her unilateral placement in the due process complaint and the Department was entitled to thirty days to remedy the issue.  See R.E., 694 F.3d at 187-88 (citing 20 U.S.C. § 1415(f)(1)(B)).  D.C.'s due process complaint, dated February 23, 2011, explained in detail that she had been informed by the staff at P188 that the school was not a seafood free environment.  (Ex. E at 3.)  The Department had thirty days to remedy the situation and/or explain any misinformation provided yet took no action.  The first notice the parent had of the possible changes that P188 would make occurred at the due process hearing beginning May 16, 2011, almost a year after E.B. had been enrolled in the Rebecca School for the 2010-2011 school year.

was a "seafood free environment" as the IEP required.
Therefore, based on the permissible testimony in the record, the
school district failed to show that the proposed placement at
P188 was adequate.  See B.R., 2012 WL 6691046, at *7 (citing
N.Y. Educ. Law § 4401(c)).

The Department offers several counterarguments.  However,
none are persuasive.  The Department claims that R.E. is
distinguishable because it concerned IEPs rather than
placements, but, as explained above, that is a distinction
without a relevant difference.  See id. at *5-6.  The Department
further argues that extending R.E. to implementation would make
all hearing testimony inadmissible to show that a proposed
school can implement an IEP.  However, the rule does not make
all hearing testimony inadmissible, but only testimony regarding
events that occurred after the unilateral placement decision was
made or testimony of information that alters the representations
that were made to the parent.

Finally, the Department argues that adopting the R.E. rule
in the context of implementation would allow the testimony of
the parent to "effectively veto" testimony of Department
witnesses and would undermine the IHO's ability to hear all of
the evidence.  (Defs.' Reply at 4.)  The Court of Appeals
rejected a similar argument by the Department in R.E., 694 F.3d

at 187.  In R.E., the Department argued that adopting a rule
against retrospective testimony would unfairly skew the
reimbursement hearing process in favor of the plaintiffs.  The
Court of Appeals explained that there was no inequity because
"both parties are limited to discussing the placement and
services . . . reasonably known to the parties at the time of
the placement decision."  Id.  Similarly, in cases such as this
case, involving implementation of the IEP, testimony from the
Department is permissible, but it must be limited to information
that was reasonably known to the parties at the time of the
placement decision.  The Department had the opportunity to
correct the placement in the thirty days following D.C.'s due
process complaint, but it failed to do so.  Because it was not
known or reasonably knowable to D.C. at the time of her
placement decision that P188 would have taken steps to create
the seafood free environment the IEP required, it was erroneous
for that information to be the basis of the SRO decision.

Upon review of the permissible testimony in the record, the
Department failed to show that P188 was a seafood free
environment.  The only permissible testimony indicates that P188
did not provide a seafood free environment and there has been no
testimony that any contrary information was ever provided to
D.C. prior to the hearing before the IHO, almost a year after

43

D.C. had placed E.B. in the Rebecca School.  The proposed placement was inappropriate under the IDEA and constituted the denial of a FAPE.

Because the proposed placement was inappropriate under the IDEA, it is unnecessary to reach the grounds asserted by D.C. for the inadequacy of the IEP, namely the 6:1:1 ratio and the failure to specify an adequate teaching method.

### B. Appropriateness of the Private Placement

Once it has been demonstrated that the IEP was inadequate or inappropriate, the plaintiff bears the burden to prove that the unilateral private placement was appropriate.  Gagliardo II, 489 F.3d at 112 (citing M.S. ex rel. S.S. v. Bd. Of Educ., 231 F.3d 96, 104 (2d Cir.2000)).  In determining whether parents have met this burden, the considerations are similar to those employed in determining whether the school district's placement was appropriate.  Frank G., 459 F.3d at 364.  While evidence of a student's success at the unilateral placement is relevant to the court's review, such evidence is not sufficient by itself to establish that the placement was appropriate.  Gagliardo II, 489 F.3d at 115 (citing Berger v. Medina City Sch. Dist., 348 F.3d 513, 522 (6th Cir. 2003); Rafferty v. Cranston Pub. Sch. Comm., 315 F.3d 21, 26-27 (1st Cir. 2002)). Courts consider the

44

"totality of the circumstances" and parents "need only demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction." Frank G., 459 F.3d at 364–65 (internal quotation marks omitted); see also R.S. ex rel. A.S., 2011 WL 1198458, at *4.

The IHO correctly found that the Rebecca School was an appropriate placement. (IHO Op. at 16-17.) The Rebecca School had a full curriculum suited to E.B.'s academic needs. (Tr. 229-30.). E.B. also had a highly individualized daily regime of different types of therapy. (Tr. 361-62.) E.B. had attended the Rebecca School for several years and had made progress in the past. (See Exs. R & S.) Moreover, as the IHO found, "[E.B.] had made progress at Rebecca during this school year. He [] made academic gains . . . improved his social and communication skills, reduced his rigidity and increased his ability to remain regulated for longer periods of time. Rebecca staff provided [E.B.] with one-to-one support to make these improvements." (IHO Op. at 17.) Because the SRO did not reach the issue, and because the IHO's reasoning is persuasive, the IHO's decision is entitled to deference. See N.Y.C. Dep't of Educ. v. V.S., No. 10 Civ. 05120, 2011 WL 3273922, at *11

(E.D.N.Y. July 29, 2011) (holding IHO determination is due "equal deference" to SRO decisions when the SRO does not address an issue reached by the IHO) (citation omitted).

Furthermore, Ms. Cohn and Ms. McCourt explained credibly the steps the Rebecca School had taken to create and maintain a seafood free environment for E.B. (Tr. 247-49, 356-58.) E.B.'s entire floor, as well as other common areas, were designated "seafood free," students were not allowed to bring seafood to school, seafood was not served at school, and a microwave was designated solely for E.B.'s use. (Tr. 247-49, 356.) The totality of the circumstances indicate that the Rebecca School was an appropriate placement for E.B.'s needs and that E.B. had made substantial and significant progress at the Rebecca School.

The defendants argue unpersuasively that the placement at the Rebecca School was inappropriate. First, the defendants argue that because the teachers at the Rebecca School allegedly used the DIR teaching method, but none of E.B.'s teachers were certified in DIR, the school was an inappropriate placement.[22]

---

[22]   The incongruity between the defendants' arguments on Burlington steps one and two is worth noting.  Throughout the portion of their brief defending the IEP at step one of the Burlington test, the Department argued that no specific teaching method was necessary.  Yet at step two, the Department claims that the failure to execute properly a specific methodology renders placement at the Rebecca School inappropriate.  The argument has no merit.

However, E.B.'s teacher, Ms. Cohn, has a master's degree in childhood general and special education, post-Master's studies in educating children with autism and severe disabilities, significant experience with autistic children, and ongoing instruction in the DIR method and professional development. (Tr. 219-23.)  The lack of official certification in a specific teaching methodology does not render the Rebecca School an inappropriate placement.  See Frank G., 459 F.3d at 364 ("[A] private placement need not provide certified special education teachers").

The defendants also argue that the Rebecca school did not address adequately E.B.'s seafood allergy.  The IHO was correct to reject the argument that E.B.'s seafood allergy was not being addressed adequately at the Rebecca School.  (IHO Op. at 17.) The defendants first argue that the school was inappropriate because there was only one registered nurse and therefore, if the nurse was absent on a day E.B. had an allergic reaction, he would be in serious danger.  However, the testimony at the impartial hearing indicated that although there was only one registered nurse at the Rebecca School, the nurse had trained the entire staff who worked with E.B. in the use of the Epi-pen. (Tr. 357.)  Ms. Cohn testified that she was trained to use an Epi-pen, which she kept in E.B.'s classroom.  (Tr. 249.)

47

The defendants also claim that because E.B.'s teacher took E.B.'s class to a pizzeria once a month without assuring that the pizzeria was a seafood free environment, the Rebecca School was not designed to meet E.B.'s placement needs.  This argument is flawed for two reasons.  First, Ms. Cohn testified that she took E.B.'s allergy into account when planning trips to the pizzeria.  (Tr. 280-81.)  Ms. Cohn testified that she would look at the products to assure no seafood was present and would question the staff to make certain that nothing contained seafood.  (Tr. 281.)  She also testified that she would only bring the class to the pizzeria when it first opened, to limit the risk that other patrons would be at the restaurant and possibly eating seafood.  (Tr.280-81.)  Second, there is no evidence that any of these things ever exposed E.B. to seafood.

### C. Consideration of the Equities

The final part of the Burlington test is whether the equities favor reimbursement.  When engaging in a review of equitable considerations under the third prong of Burlington, the court enjoys "broad discretion."  Carter, 510 U.S. at 16 (quoting Burlington, 471 U.S. at 369) (internal quotation marks omitted).  The Court "must consider all relevant factors, including the appropriate and reasonable level of reimbursement

48

that should be required." Id. "[A] major consideration in
deciding whether the third factor is satisfied is whether the
parents have cooperated with the [Department] throughout the
process to ensure their child receive[s] a FAPE." Bettinger v.
N.Y.C. Bd. of Educ., No. 06 Civ. 6889, 2007 WL 4208560, at *6
(S.D.N.Y. Nov. 20, 2007); see also Frank G., 459 F.3d at 363-64.
The equities in this case favor the plaintiff.

The IHO found that "the evidence establishes that the
parent cooperated with the CSE by, over the years, attending CSE
meetings as well as visiting the proposed placement and then
communicating her concerns in writing to the CSE." (IHO Op. at
17.)  The SRO failed to address this finding and it is entitled
to deference.  See V.S., 2011 WL 3273922, at *11.

In an attempt to overcome the IHO decision, the defendants
argue that the equities do not favor the plaintiff because D.C.
dealt with the CSE in bad faith.  According to the defendants,
because D.C. signed an enrollment contract with the Rebecca
School on April 30, 2010, before the CSE meeting, D.C. never
intended to cooperate with the Department in its efforts to
provide E.B. with a FAPE.  The defendants' argument takes the
facts out of context.

The enrollment contract with the Rebecca School did not
demonstrate that D.C. had no intention of cooperating with the

49

CSE.  As of April 2010, the Department had not yet contacted D.C. to schedule a CSE meeting to create an IEP for E.B., even though the plaintiff represents that the twelve month school year was set to begin in July 2010.  (Pl.'s Mem. Supp. Mot. Summ. J. at 6.)  D.C. represents that she signed an initial enrollment contract with the Rebecca School in order to guarantee E.B. a spot if the Department could not provide a placement.  (Verified Ans. ¶¶ 44-45; Pl.'s Mem. Opp. Defs.' Cross-Mot. Summ. J. at 24.)  Importantly, the contract allowed D.C. to withdraw E.B. from the Rebecca School at no financial penalty—except for the non-refundable deposit of $250—until September 2010, provided that D.C. enrolled E.B. in a school recommended by the Department.  (Tr. 367; Ex. Q at 2-3.)  Therefore, contrary to the Department's argument, the signing of the contract was not evidence of D.C.'s bad faith.

The Department also argues that because D.C. sent her notification of unilateral placement on June 22, 2010, before she had ever toured P188, D.C. had no intention of accepting any placement the Department offered.  However, D.C.'s explanation for her unilateral placement letter is persuasive.  The FNR was delivered to D.C. on June 16, 2010, only a few weeks prior to the July start of the twelve month school year.  (Ex. B.)  The FNR required that D.C. reject placement by June 28, 2010.  (Ex.

50

B.)  D.C. contacted P188 the next day but she was told that the earliest she could tour the facility was July 13, 2010.  (Pl.'s R. 56.1 Stmt. ¶ 2; Defs.' 56.1 Resp. ¶ 2; Ex. B.)  Because there was no way for D.C. to assure that P188 was an adequate placement for E.B. before both the beginning of the July 2010 summer session and the FNR deadline, D.C. decided to keep E.B. at the Rebecca School, at least temporarily.  (Pl.'s R. 56.1 Stmt. ¶ 9; Defs.' 56.1 Resp. ¶ 9; Ex. C.)

Moreover, had D.C. failed to provide notice of unilateral placement ten business days before she placed E.B. at the Rebecca School, the Department could have denied reimbursement for failure to comply with the IDEA procedure.  See 20 U.S.C. § 1412(a)(10)(C) (iii)(aa)-(bb).  Therefore, because D.C. could not visit P188 before the July 2010 summer session began, yet needed to be reimbursed for the Rebecca School tuition, D.C. was forced by circumstances to provide notice of unilateral placement in order to be eligible for tuition reimbursement under the IDEA.

D.C. attended the CSE meeting, cooperated with the CSE in the development of the IEP, attempted in good faith to cooperate with the placement decision, and only unilaterally placed E.B. when it was required by the timing of the school year and the

procedural requirements of the IDEA.  The equities favor payment of the tuition by the Department.

E.B.'s proposed placement at P188 was inadequate to provide E.B. with a FAPE.  The placement at the Rebecca School was appropriate and the equities favor direct payment of the Rebecca School tuition.  Accordingly, the plaintiff's motion for summary judgment on her IDEA claim is **granted** and the defendant's cross motion is **denied**.  The plaintiff is entitled to payment for E.B.'s tuition expenses for the 2010-2011 school year, including the $500 deposit, as well as E.B.'s transportation costs to and from the Rebecca School.  Additionally, the plaintiff is awarded reasonable attorneys' fees and costs pursuant to 20 U.S.C. § 415(i)(3)(B)(i)(I).

## IV.

The plaintiff further moves for summary judgment under Section 504 and alleges that the Department's failure to offer E.B. a seafood free placement constituted a violation of Section 504.  The defendants cross-move for summary judgment on the Section 504 claim.  Unlike the IDEA claim, the Section 504 claim was not decided by either the IHO or the SRO.  (<u>See</u> SRO Op. at 7 n.9.)  Unlike the quasi-administrative standard for summary judgment that applied to analysis of the IDEA claim, the

ordinary standard for summary judgment applies to the Section
504 claim.  See C.L. v. Scarsdale Union Free Sch. Dist., No. 11
Civ. 5242, 2012 WL 6646958, at *6-7 (S.D.N.Y. Dec. 21, 2012)
(applying ordinary summary judgment standard to Section 504
claim brought concurrently with IDEA claim);
Pinn v. Harrison Cent. Sch. Dist., 473 F. Supp. 2d 477, 483
(S.D.N.Y. 2007) ("Unlike in the case of Plaintiff's IDEA claim,
summary judgment is appropriate in the case of their
Rehabilitation Act claim only if there is 'no genuine issue as
to any material fact.'").


### A.

The standard for granting summary judgment is well
established.  "The court shall grant summary judgment if the
movant shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477
U.S. 317, 322 (1986).  "[T]he trial court's task at the summary
judgment motion stage of the litigation is carefully limited to
discerning whether there are genuine issues of material fact to
be tried, not to deciding them.  Its duty, in short, is confined
at this point to issue-finding; it does not extend to issue-
resolution."  Gallo v. Prudential Residential Servs. Ltd.

P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).  The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  The substantive law governing the case will identify those facts which are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also Gallo, 22 F.3d at 1223.  Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party.  See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).  If the moving party meets its burden, the burden shifts to the nonmoving party to bring forward "specific facts showing a genuine issue for trial."  Ovesen v. Mitsubishi Heavy Indus. of Am., Inc., No. 04 Civ. 2849, 2012 WL

677953, at *1 (S.D.N.Y. Mar. 1, 2012) (citation omitted).  The
non-moving party must produce evidence in the record and "may
not rely simply on conclusory statements or on contentions that
the affidavits supporting the motion are not credible." Ying
Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993);
see also Scotto v. Almenas, 143 F.3d 105, 114–15 (2d Cir.1998)
(collecting cases); Ovesen, 2012 WL 677953, at *1.  "When no
rational juror could find in favor of the nonmoving party
because the evidence to support its case is so slight, there is
no genuine issue of material fact and a grant of summary
judgment is proper." Gallo, 22 F.3d at  1224 (citation
omitted).  If there are cross motions for summary judgment, the
Court must assess each of the motions and determine whether
either party is entitled to judgment as a matter of law.  See
Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir.
1993) (citation omitted); see also Admiral Indem. Co. v.
Travelers Cas. & Sur. Co. of Am., 881 F. Supp. 2d 570, 574
(S.D.N.Y. 2012).

     "[C]aution must be exercised in granting summary judgment
where intent is genuinely in issue, [although] summary judgment
remains available to reject discrimination claims in cases
lacking genuine issues of material fact." Chambers v. TRM Copy
Ctrs. Corp., 43 F.3d 29, 40 (2d Cir. 1994) (internal citations

omitted); see also Abdu-Brisson v. Delta Air Lines, Inc., 239
F.3d 456, 466 (2d Cir. 2001) ("[S]ummary judgment may be
appropriate even in the fact-intensive context of discrimination
cases. . . . [T]he salutary purposes of summary judgment —
avoiding protracted, expensive and harassing trials —  apply no
less to discrimination cases than to other areas of
litigation.") (alteration and internal quotation marks and
citations omitted).

## B.

Section 504 of the Rehabilitation Act of 1973 provides that
"[n]o otherwise qualified individual with a disability in the
United States . . . shall, solely by reason of her or his
disability, be excluded from the participation in, be denied the
benefits of, or be subjected to discrimination under any program
or activity receiving Federal financial assistance . . . ."  29
U.S.C. § 794(a).  "A plaintiff may assert a Section 504 claim in
conjunction with an IDEA claim on the theory that he has been
denied access to a free appropriate education, as compared to
the free appropriate education non-disabled students receive."
Scarsdale Union Free Sch. Dist., 2012 WL 6646958, at *7
(internal quotation marks and citation omitted).   "The scope of
protection under the Rehabilitation Act differs from that under

the IDEA." Id. "Specifically, Section 504 offers relief from discrimination, whereas IDEA offers relief from inappropriate education placement, regardless of discrimination." Gabel ex rel. L.G. v. Bd. of Educ., 368 F. Supp. 2d 313, 333 (S.D.N.Y. 2005).

"To recover under the Rehabilitation Act, there must be evidence that: (1) the student is disabled; (2) the student is otherwise qualified to participate in school activities; (3) the school or the board receives federal financial assistance; and (4) the student was excluded from participation in programs at, denied the benefits of, or subject to discrimination at, the school on the basis of her disability." Schreiber v. E. Ramapo Cent. Sch. Dist., 700 F. Supp. 2d 529, 564 (S.D.N.Y. 2010) (citing Gabel, 368 F. Supp. at 334.)

Here, it is undisputed that the first three conditions are met, therefore the only issue is whether P188 discriminated against E.B. To demonstrate discrimination under Section 504, "[t]he plaintiff is not required to show personal animosity or ill will," but the evidence must show "something more than proof of a mere violation of IDEA . . . ." Gabel, 368 F. Supp. at 334 (citations omitted). Discrimination may be inferred when there is "evidence that a school district acted with deliberate or reckless indifference to the student's federally protected

rights or with bad faith or gross misjudgment." <u>Schreiber</u>, 700 F. Supp. 2d at 564 (internal quotation marks and citation omitted); <u>Pinn</u>, 473 F. Supp. 2d at 483 ("Where a plaintiff asserts denial of a free appropriate public education . . . ., [the] plaintiff must demonstrate bad faith or gross misjudgment.").

The plaintiff argues that the Department violated Section 504 and discriminated against E.B. by denying him access to a FAPE because of his seafood allergy in two distinct ways. First, the plaintiff argues that the Department demonstrated gross misjudgment when it recommended placement at P188, a school with an environment that was not seafood free and could not accommodate E.B. without a substantial risk to his health and safety.  Second, the plaintiff claims that the Department demonstrated reckless indifference to E.B.'s needs when it received D.C.'s letter explaining that P188 was not a seafood free environment but failed to offer E.B. an alternative placement.  The defendants' only relevant counterargument[23] is that even if the Department failed to provide E.B. with a FAPE because of failure to implement the IEP, because P188 was

---

[23] The defendants' also argued that there was no Section 504 violation because the Department had provided E.B. with a FAPE. However, as explained above, the Department did not provide a FAPE and therefore this argument is without merit.

prepared to address E.B.'s needs and would have put plans and protocols into place had E.B. attended, the Department did not act with gross misjudgment or reckless indifference to E.B.'s needs.  Based on the record, summary judgment must be denied for both parties.  See Gabel, 368 F. Supp. 2d at 336-37 (denying cross-motions for summary judgment on Section 504 claim on ground that whether the alleged discrimination rose to level of Section 504 claim was a dispute of material fact).

The defendant's motion must be denied because drawing all reasonable inferences in the plaintiff's favor, it cannot be concluded as a matter of law that the Department's actions did not rise to the level of reckless indifference or gross misjudgment.  See id.  In this case, a rational juror could conclude that the Department's failure to recommend an alternative placement for E.B., or to at least contact D.C. and explain that P188 could potentially accommodate E.B.'s allergy, rose to the level of reckless indifference and/or gross misjudgment.  See id. at 335 ("I can only grant the District's motion if I conclude, as a matter of law, that no reasonable juror could find that the District's numerous errors . . . do not rise to the level of gross negligence or reckless indifference.  Frankly, I cannot make such a finding."); see also R.B. v. Bd. of Educ. of N.Y.C., 99 F. Supp. 2d 411, 419

59

(S.D.N.Y. 2000) (denying defendants' motion to dismiss Section 504 claim based on school district's failures to take actions to implement child's IEP).  The defendants' motion is denied.

The denial of the defendants' motion does not entitle the plaintiff to summary judgment.  Although the plaintiff presents evidence that the Department may have acted recklessly, the evidence is not sufficient to conclude that no rational jury could find in favor of the Department.  Id. at 335.  Taking the evidence in the light most favorable to the defendants, there is at least a dispute of material fact whether the Department's actions rose to the level of a Section 504 violation that prevents granting summary judgment.  Therefore, the plaintiff's motion for summary judgment must also be **denied**.

**CONCLUSION**

The Court has considered all of the arguments raised by the parties.  To the extent not specifically addressed, they are either moot or without merit.  For the reasons explained above, the plaintiff's motion for summary judgment on the IDEA claim is **granted**.  The defendants' motion for summary judgment on the IDEA claim is **denied**.  The cross-motions for summary judgment on the Section 504 claim are **denied.  The Clerk is directed to close docket nos. 9 and 15.**

SO ORDERED.

Dated:  New York, New York
        March 25, 2013                  _____/S/_____
                                             John G. Koeltl
                                     United States District Judge